## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 20-221 |
| RAFAEL VEGA-RODRIGUEZ | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

On March 1, 2020, the defendant Rafael Vega-Rodriguez made a choice. When faced with the prospect of going to jail, he tried to kill the three FBI agents who were attempting to execute a warrant for his arrest.  He pulled a gun that was concealed near his waist, extended his arm, and fired four times at the agents, who were separated from him by only the width of a car.  Mercifully, he missed, but the impact of the defendant's actions goes well beyond the potential harm to his victims or anyone unlucky enough to be on the street when he opened fired.  This was nothing short of an attack on the rule of law.

The defendant was later charged with three counts of attempted first degree murder of a federal officer, three counts of assault of a federal officer, one count of using and carrying, and discharging, a firearm during and in relation to a crime of violence, and one count of possession of a firearm by a felon.  On February 2, 2023, he was convicted on all counts.  This Court must now impose a sentence commensurate with his crimes, as those crimes fit within a much larger pattern of criminal conduct.

1

The applicable sentencing guideline range in this case is 360 months to life imprisonment, a range reserved for those criminals who have committed the offenses deemed most harmful to society and its innocent members and who are most likely to continue committing crimes if not confined. But the defendant is also subject, due to his use of a firearm during a violent crime, to a 10-year mandatory minimum term of imprisonment, which must run consecutive to any other sentence imposed in this case. The effective guideline range is therefore 480 months to life imprisonment.

The egregious nature of the defendant's crimes, coupled with his lengthy and varied criminal history, demonstrates the danger he poses to society and demands a sentence *within* the applicable range, and not below or near the bottom of it. The government therefore respectfully requests a sentence of 540 months' imprisonment, to be followed by a five-year term of supervised release.

## I.   BACKGROUND

On April 6, 2022, a grand jury sitting in the Eastern District of Pennsylvania returned an eight-count superseding indictment, charging the defendant with the following crimes: three counts of attempt to commit murder of a federal officer, in violation of Title 18, United States Code Sections 1114(3) and 1113 (Counts One through Three); three counts of assault on a federal officer, in violation of Title 18, United States Code, Section 111(a)(1) and (b) (Counts Four through Six); one count of using and carrying, and discharging, a firearm during and in relation to a crime of violence, in violation of Title 18, United States Code,

Section 924(c)(1)(A)(iii) (Count Seven); and one count of possession of a firearm by a felon, in violation of Title 18, United States Code, Section 922(g)(1) (Count Eight).

On February 2, 2024, following a five-day trial, a jury found the defendant guilty on all counts.  The jury specifically found the defendant guilty on all three counts of attempted first degree murder, as opposed to any lesser included offenses.  Sentencing is scheduled for July 24, 2024, at 2:00 p.m.

## II.    FACTS ESTABLISHED AT TRIAL

During the trial in this matter, the government introduced evidence to establish the following facts:

On the evening of March 1, 2020, four FBI agents – F.N., F.C., A.J., and E.G.  – were conducting surveillance around 547 Gordon Street in Reading, Pennsylvania. They were attempting to locate the defendant, in part, because the defendant, who was on state parole, had absconded from his state supervision, and the Pennsylvania Board of Probation and Parole had issued a warrant for the defendant's arrest.

At approximately 6:00 p.m., the four agents began their surveillance. Three of the agents – F.N., F.C., and A.J. – were in an unmarked, silver minivan. The fourth agent, E.G., was in a separate unmarked vehicle. In anticipation of the surveillance, the agents had installed a pole camera near 547 Gordon Street, which was an address with which the defendant had been associated. During the

surveillance, two of the agents were receiving a live feed from the pole camera to their cell phones.

At approximately 11:45 p.m., the agents saw on the pole camera feed an individual, who they believed could be the defendant, leaving 547 Gordon Street, so E.G. drove his unmarked vehicle toward where he expected the defendant to be. Minutes later, E.G. communicated with the other agents and confirmed that he had positively identified the defendant. He further advised the other agents that the defendant and another man, later identified as Karvin Negron-Diaz, were headed west, away from a Getty Mart gas station on the corner of the intersection of Schuylkill Avenue and West Greenwich Street, and would soon be walking onto West Greenwich Street.

The other three agents then approached the corner of Schuylkill Avenue and West Greenwich Street in their minivan. At the time, A.J. was in the driver's seat, wearing an FBI-issued green concealable soft ballistic panel carrier, with an "FBI" placard on the front, and a quarter zip sweatshirt over the carrier. F.C. was in the front passenger seat, and he was wearing a black FBI-issued tactical vest with placards on both the front and back, with the word "POLICE" in large white lettering. F.N., who was not wearing protective gear, was in the rear of the vehicle, but was leaning forward between A.J. and F.C.

F.C. and F.N. focused on the defendant, who was walking on the left of Negron-Diaz (from the agents' vantage point), and whom they initially identified by his height, which they knew to be only 5'3". The defendant had his hands in

4

either his sweatshirt pocket or under his sweatshirt. As the defendant approached, he stared into the minivan, and the agents believed that he had identified them as law enforcement officers.  The agents decided to detain the defendant on the outstanding state arrest warrant and call Reading Police Department to take him into custody.

F.C. removed his weapon from the holster, held it down to his right side, and used his left hand to reach across his body and open the front passenger door of the minivan. F.C. then stepped out of the passenger side of the minivan, as A.J. stepped out of the driver's side of the minivan and F.N. opened the sliding door to the back seat.

The defendant and Negron-Diaz had continued walking, with the defendant closer to the street, and the width of a single parked car separating him from the agents. By this time, the defendant was no longer staring in the minivan; rather, he looked straight ahead such that the agents were looking at his right profile as they exited their minivan.

As F.C. stepped out from the passenger side of the minivan, he put both hands on his weapon and said, "Hey," (or something similar) to get the defendant's attention. Without turning to the agents or missing a beat, the defendant immediately drew a handgun from the area of his waistband, suggesting that he expected their approach, and pointed his right arm out to the side, bent over, and fired in the direction of the agents.

Believing that the defendant posed an immediate and deadly threat to him and his fellow agents, F.C. raised his weapon and returned fire, shooting three times as he moved to take cover behind the parked car that separated him from the defendant.  F.N. saw the flash from the gun pointed toward him and fell backwards into the minivan.  A.J., who had exited the minivan on the driver's side, moved toward the back of the vehicle. The defendant ran forward in a prone position and continued firing, with his arm extended in the direction of the agents, who were giving him commands to stop. In total, the defendant fired four shots at the agents.

A.J. pursued the defendant and Negron-Diaz as they fled onto Miltimore Street and continued running south. F.C. followed behind A.J., and the agents lost sight of the defendant and Negron-Diaz as they turned right down an unmarked alley.  Negron-Diaz was later found at a hospital, where he was receiving treatment for a bullet wound to his left thigh, but the defendant disappeared.

On March 2, 2020, investigators obtained information that the defendant had possibly fled to a residence at 135 East Main Street in Leola, Pennsylvania ("135 Main Street"). At approximately 11:40 p.m., federal and state law enforcement went to 135 Main Street and determined that the defendant was hiding inside the residence. They took steps to prompt his surrender, and when he did, they arrested him.

Federal investigators obtained consent to search the property, and during the search, they found an Avengers backpack stuffed between a sofa and the wall inside a stand-alone garage adjacent to the townhouse. Inside the backpack, they found a black Beretta handgun, with an extended magazine,[1] a Ziploc bag containing additional ammunition, and a pair of Franklin baseball batting gloves, all concealed by diapers and baby clothes. Subsequent testing at the FBI laboratory confirmed that the Beretta handgun was the same gun the defendant used to try to kill the agents. The defendant's DNA was found on the Beretta and inside the batting gloves found inside the backpack.

Two agents with the FBI conducted a post-arrest interview of the defendant inside 135 Main Street. After receiving *Miranda* warnings, the defendant refused to sign the written waiver, but he verbally waived his rights and agreed to speak with the agents. During the interview, he made several self-exculpatory statements, which were presented to the jury through the testimony of an FBI agent, but none of which the jury seem to have credited.

One of the agents interviewing the defendant asked the defendant what happened to the gun that he used during the shooting. The defendant did not reply. The agent then asked the defendant if the gun located in the garage would match the shell casings recovered from the scene of the shooting.  The defendant

---

[1] The black beretta handgun is more fully described as a black Beretta 9 mm handgun, model 92FS, type M9A1, bearing serial number BER674094, with an "inflight" laser sight.  An ATF trace revealed that the firearm was reported stolen in 2019 from the glove box of the gun owner's vehicle.

responded, "Most likely."  The agents also asked the defendant if he used a Facebook page under the name "Billy Bob," which they believed to be his. The defendant laughed but did not answer the question.

At trial, the government established that the Billy Bob Facebook profile was indeed the defendant's profile, and the government introduced a number of exhibits created from his Facebook posts.  These included musings about being a "shooter" and reflected a strong animosity toward police.

## III.  SENTENCING CALCULATION

### A.  Statutory Maximum and Mandatory Minimum Sentences

The Court may impose the following statutory maximum and mandatory minimum sentences:

On each of Counts One, Two, and Three (attempted murder of federal officers, in violation of 18 U.S.C. §§ 1114(a)(3) and 1113): a maximum of 20 years' imprisonment; a maximum of three years' supervised release; a maximum $250,000 fine; and a mandatory special assessment in the amount of $100.

On each of Counts Four, Five, and Six (assault on federal officers, in violation of 18 U.S.C. §§ 111(a)(1) and (b)): a maximum of 20 years' imprisonment; a maximum of three years' supervised release; a maximum $250,000 fine; and a mandatory special assessment in the amount of $100.

On Count Seven (using and carrying, and discharging, a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §  924(c)(1)(A)(iii)): a maximum of life imprisonment, with a 10-year mandatory minimum term of

imprisonment, consecutive to any other sentence imposed; a maximum of five years' supervised release; a maximum $250,000 fine; and a mandatory special assessment in the amount of $100.

On Count Eight (possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1)): a maximum of 10 years' imprisonment; a maximum of three years' supervised release; a maximum $250,000 fine; and a mandatory special assessment in the amount of $100.

**Total Maximum and Mandatory Minimum Sentence:** A maximum of life imprisonment, with a 10-year mandatory minimum term of imprisonment, consecutive to any other sentence imposed; a maximum of five years' supervised release; a maximum $2,000,000 fine; and a mandatory special assessment in the amount of $800. Forfeiture of any firearms or ammunition involved in or used in the offenses may be ordered.

     B.    <u>Sentencing Guidelines Calculation</u>

The Probation Office correctly calculated the defendant's advisory guideline range in the following way:

As an initial matter, the Probation Office addressed the grouping of the counts.  Because there are three separate victims, there are three grouped counts: Counts One and Four (related to F.C.) group; Counts Two and Five (related to A.J.) group; and Counts Three and Six (related to F.N.) group. PSR ¶ 32.  Count Eight also groups with those counts, whereas Count Seven does not group with any other count. PSR ¶ 32.

Counts One, Two, and Three have the highest offense level, so the base offense level for those counts, which is 33, is used for each group.[2] PSR ¶¶ 33, 35, 41, and 47.  Six levels are then added because the victims were law enforcement officers. PSR ¶¶ 37, 43, and 49.  This results in an adjusted offense level of 39 for each group, and so 39 is the applicable offense level. PSR ¶¶ 40, 46, 52, and 54. Because there are three groups, each with a base offense level of 39, the Probation Office correctly applied a three-level multiple count adjustment for a total offense level of 42. PSR ¶¶ 53-56.

Based on a criminal history score of 14 points, which includes points for prior firearm and drug-related convictions and is described in more detail below, the defendant falls into the highest possible Criminal History Category of VI. PSR ¶¶ 60-78. With an offense level of 42, and a Criminal History Category of VI, the defendant faces an advisory guideline range of 360 months to life imprisonment. PSR ¶ 107.  This is then subject to an additional 10-year mandatory minimum term of imprisonment, which must run consecutive to any other sentence imposed, for an effective guideline range of 480 months to life imprisonment. PSR ¶ 107.

---

[2] The defense has objected to the base offense level, claiming that it should be 27 instead of 33, but at this point, the defendant has offered no explanation. Indeed, it is difficult to imagine one, as the jury specifically found that the defendant was guilty of attempted first degree murder.

**IV.      ANALYSIS**

A thorough consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the most appropriate sentence is a very significant sentence within, and not below or near the bottom of, the properly calculated Sentencing Guideline range.  The government therefore respectfully recommends a sentence of 540 months' imprisonment to be followed by a 5-year term of supervised release.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence

disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).[3]

## Consideration of the Section 3553(a) Factors

The Section 3553(a) factors are in place to assist the Court in determining the appropriate sentence for each defendant.  In this case, an analysis of these factors demands that the defendant be sentenced well within, and not below or near the bottom of, the applicable sentencing guideline range.

1. **The nature and circumstances of the offense and the history and characteristics of the defendant**

   a.   The nature and circumstances of the offense

The seriousness of the defendant's actions cannot be overstated.  Our ordered society depends on the ability of those in authority, lawfully acting on behalf of the state, to enforce our laws.  Those who question that authority have peaceful options, including by pleading their case in a court of law.

---

[3] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'"  *United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (quoting *United States v. Navedo-Concepcion*, 450 F.3d 54, 58 (1st Cir. 2006)).

The defendant made a different choice.  When faced with the prospect of apprehension to answer for his crimes, the defendant chose to strike first and to strike violently.  He decided that his freedom, which he did not earn, was more valuable than the lives of those agents (or anyone else unlucky enough to be on the street that night).  Such a lack of concern for the rule of law or for human life has no place in a civil society.

But we must also weigh heavily the personal impact on the victims in this case.  Here, the defendant tried to kill three FBI agents who were just doing their jobs.  The government expects that one or more of the agents will address the Court at sentencing, and they will be able to address the impact on them far better than government counsel ever could.  But it is worth noting that law enforcement officers go to work every day to serve and protect our communities.  They understand that their service places them in danger, but when that potential for danger becomes a reality, we must act to protect them by severely punishing those who try to harm them.

    b.   <u>The history and characteristics of the defendant</u>

To be clear, what happened on March 1, 2020, was no mistake.  In specifically finding the defendant guilty of attempted first degree murder, the jury found that he acted with premeditation and malice aforethought.  He identified the agents as law enforcement, and he made a choice to try to kill them.  Notably, that choice was entirely consistent with his history and characteristics, as reflected in his long and varied criminal history and in his words, as reflected

on his Facebook posts.

Over the course of his life, the defendant has incurred a stunning number of convictions and violations of court-supervision, demonstrating a severe lack of respect for the rule of law.  In fact, it appears from his criminal history that the defendant, who will turn 42 this year, has been on either court supervision or incarcerated for the last 30 years, reflecting who he is – an unrepentant criminal with little hope of rehabilitation.

His criminal ways began at the tender age of 11 when he was charged with possession of heroin and methadone and then committed to a children's home and subject to intensive probation.  This was in August 1994.  PSR ¶ 60. Three years later, at the age of 14 and while still on probation, the defendant was arrested while in possession of 17 packets of cocaine. He was charged with possession of a controlled substance and again placed on intensive supervision. PSR ¶ 61. But he again violated his probation two months later, in October 1997, when he sold heroin to an undercover police officer.  PSR ¶ 62. Though he does not appear to have been charged as a juvenile with any gun-related crimes, records related to his juvenile adjudications include reference to his unlawful possession of a firearm when selling drugs, suggesting that his violent streak extends back at least that far. PSR ¶ 63.

Less than two years later, in April 1999, the defendant was discharged from placement, but he was arrested again a few months later, in August 1999, and charged with possession with intent to distribute cocaine.  PSR ¶ 65. Only 16,

14

he was charged as an adult and was sentenced to 9 to 23 months imprisonment. PSR ¶ 65. Notably, none of these prior law enforcement encounters count toward his criminal history calculation due to the time that has passed.

Following his August 1999 arrest and conviction, the defendant was paroled, yet again he violated the terms of his supervision.  Specifically, in August 2020, at the age of 17, the defendant was pulled over, and at that time, he was in possession of a loaded firearm and several packets of cocaine.  The defendant was found guilty and sentenced to 60 to 120 months imprisonment.  PSR ¶ 66. The defendant was released nearly 10 years later, but while incarcerated, he attacked another inmate, slicing his face with a homemade weapon, leading to even more criminal charges and a sentence of 4 to 8 years' imprisonment. PSR ¶ 67.

He was released from imprisonment in January 2010, and a little more than a year later, he incurred yet another conviction, this time for retail theft after he and another man stole clothing from a department store.  PSR ¶ 68. A couple months after that, he was arrested by officers responding to a report of a fight in Reading.  The responding officers found the defendant in possession of a firearm and charged him.  Inexplicably, it appears that he was not detained on this charge, so three months after that, police responded again to a call for fight during which a male – later determined to be the defendant – pulled a gun on one of two women involved in the altercation.  Upon the police arrival, the defendant fled but he was arrested the next day and charged with a host of crimes, including possession of a firearm by a prohibited person.  All three

incidents were consolidated for sentencing.  He was sentenced to probation in connection with the theft charges, to 3.5 to 7 years for the first firearm possession, and 5 to 10 years for the second firearm possession.  PSR ¶¶ 68-70.

The defendant was paroled on May 22, 2017.  He absconded twice.  The first time resulted in a term of imprisonment.  The second time resulted in the arrest warrant the agents were attempting to execute when the defendant pulled his gun and fired at them.

Nothing could possibly justify this level of criminality, and the defendant has offered nothing, at least in his presentence investigation interview to explain, much less excuse, his behavior.  The defendant described a "'regular childhood' childhood devoid of any neglect or abuse."  It appears that may not be entirely accurate, as the defendant's aunt described his childhood as "chaotic" and pointed to the mental health struggles and alcoholism of the men in his family. Notably, although the defendant's aunt believes he would benefit from mental health treatment, the defendant claims no physical ailments and no mental health issues.  He also reports no alcohol or illicit drug use and no family history of substance abuse, which might serve to mitigate his sentence.

In any event, the defendant has not pinned his choices on any environmental factor from his youth, and nor should this Court.  Rather, the Court should see the defendant for who he is – a menace to society who has flouted the law at every turn for the past three decades.  He should be sentenced accordingly.

16

**2.    The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

The defendant has breached the social contract countless times in myriad ways, from selling drugs, to stealing, to pulling guns on people, and most recently, to using deadly force against members of law enforcement.  His lack of respect for the law is persistent, and he has committed offenses of increasing seriousness.  The Court's sentence should reflect these facts.

The Court's sentence should also be a just one.  The government recognizes the severity of its sentencing recommendation and we do not make it lightly.  But to kill (or try to kill) a law enforcement officer in the execution of his or her duties is as antisocial an act as one can do.  Here, the defendant tried to kill three agents, and he did so with premedication and malice aforethought, as determined by a jury.  The recommended sentence is severe, but it is also fair and just.

**3.    The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant**

Deterrence is an important consideration in this case.  Given the defendant's prior criminal acts, he needs to be specifically deterred from committing future crimes, and the significant term of imprisonment recommended by the government will do just that by removing him from society for decades.

But general deterrence is also – and especially – important. As the courts of appeals have held both before and after *Booker*, deterrence under Section

3553(a) is not limited to deterrence of the particular defendant. *See, e.g.*, *United States v. Jordan*, 435 F.3d 693, 698 (7th Cir. 2006) (describing how Section 3553(a) "specifies that the court may consider the need for general deterrence and respect for the law"); *United States v. Glover*, 431 F.3d 744, 751 (11th Cir. 2005) (noting that pre *Booker* and post *Booker,* "the underlying goals of the statute and the Guidelines are retribution, general deterrence, incapacitation, and rehabilitation" (internal quotation marks omitted)); *see also United States v. Yeaman*, 248 F.3d 223, 232 (3d Cir. 2001) (referring to Section 3553(a)'s goals of "general deterrence, specific deterrence, retribution, and rehabilitation").

Here, the defendant opened fire on three FBI agents in the line of duty. Sadly, he is not alone, as the number of attacks against and killings of law enforcement has grown in recent years. *See* https://www.fbi.gov/news/press-releases/fbi-releases-officers-killed-and-assaulted-in-the-line-of-duty-2023-special-report-and-law-enforcement-employee-counts. This cannot be tolerated, and anyone who would think to attack law enforcement – whether that be in the execution of a warrant or any other function – must understand that their decision to harm law enforcement will result in them spending most – if not all – of their remaining days in prison.

### 4. The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner

The defendant's needs for "educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." 18 U.S.C.

§ 3553(a)(2)(D) can be met by the Bureau of Prisons, and the government is

aware of nothing to suggest otherwise.  To the extent the defendant is in need of

mental health evaluation and treatment, that too can be addressed by the BOP.

**5.**     **The guidelines and policy statements issued by the**
           **Sentencing Commission and the need to avoid**
           **unwarranted sentence disparities among defendants with**
           **similar records who have been found guilty of similar**
           **conduct**

While the Sentencing Guidelines are advisory, they remain the sole means

available for assuring some measure of uniformity in sentencing, fulfilling a key

Congressional goal in adopting the Sentencing Reform Act of 1984. Reference to

the Guidelines, while carefully considering the 3553(a) factors particularly

relevant to an individual defendant, is the only available means of preventing the

disfavored result of basing sentences on the luck of the draw in judicial

assignments.  The Third Circuit explained:

> Even under the current advisory system, district courts must
> "meaningfully consider" § 3553(a)(4), i.e., "the applicable
> category of offense . . . as set forth in the guidelines."  The
> section of *Booker* that makes the Guidelines advisory explains
> that "the remaining system, while not the system Congress
> enacted, nonetheless continue[s] to move sentencing in
> Congress' preferred direction, *helping to avoid excessive*
> *sentencing disparities while maintaining flexibility sufficient*
> *to individualize sentences where necessary*."  *Booker*, 543
> U.S. at 264-65 (emphasis added).  The Guidelines remain at
> the center of this effort to "avoid excessive sentencing
> disparities," and, as the *Booker* Court explained, the
> Sentencing Commission will continue "to promote uniformity
> in the sentencing process" through the Guidelines.  *Id.* at 263.
> We have likewise observed that the "'Guidelines remain an
> essential tool in creating a fair and uniform sentencing regime
> across the country.'"  *Cooper*, 437 F.3d at 331 (quoting *United*

*States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005)).

*United States v. Ricks*, 494 F.3d 394, 400 (3d Cir. 2007) (emphasis in original).

Therefore, the Supreme Court has held that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process" in order to assure fair, proportionate, and uniform sentencing of criminal offenders.  *Gall*, 128 S.Ct. at 596 n.6. Here, the recommended term of imprisonment of 540 months is within the applicable Guideline range and therefore, by definition, will not result in an unwarranted disparity.

## V.     CONCLUSION

In sum, all of the appropriate considerations of sentencing favor the imposition of a significant term of imprisonment within the applicable guideline range.  The recommended sentence, which is 60 months above the bottom of the applicable guideline range, is fair, proportionate, and in line with sentences nationwide for similarly situated defendants. Moreover, the government is aware of little which militates against imposition of a sentence within the applicable range; to the contrary, the 3553(a) factors on balance support the imposition of a sentence well above the bottom of that range. Accordingly, the government respectfully recommends a sentence of 540 months' imprisonment.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney


*/s Timothy M. Stengel*
TIMOTHY M. STENGEL
EVERETT WITHERELL
Assistant United States Attorneys

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Government's

sentencing memorandum has been served by electronic filing and by email upon:

Kathleen Gaughan, Esquire
Elizabeth Toplin, Esquire
*Attorneys for Rafael Vega-Rodriguez*


<u>*/s Timothy M. Stengel*</u>
TIMOTHY M. STENGEL
Assistant United States Attorney


DATED:     July 18, 2024